1

**GAUNTLETT & ASSOCIATES**
David A. Gauntlett (SBN 96399)
info@gauntlettlaw.com
James A. Lowe (SBN 214383)
jal@gauntlettlaw.com
18400 Von Karman, Suite 300
Irvine, California 92612
Telephone: (949) 553-1010
Facsimile: (949) 553-2050

Attorneys for Plaintiff
THE UPPER DECK COMPANY

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE UPPER DECK COMPANY, a Nevada corporation,<br><br>                    Plaintiff,<br><br>          vs.<br><br>LIBERTY MUTUAL FIRE INSURANCE CO., a Wisconsin corporation,<br><br>                    Defendant. | Case No.: **'19CV0752 L    JLB**<br><br>**COMPLAINT FOR:**<br>(1) **DECLARATORY RELIEF ON DEFENDANT'S DUTY TO DEFEND**<br>(2) **BREACH OF CONTRACT**<br>(3) **BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**<br><br>**JURY TRIAL DEMANDED** |

244539_3--

COMPLAINT

In this insurance coverage suit, Plaintiff The Upper Deck Company ("Upper Deck" or "Plaintiff"), seeks: **(i)** a judicial declaration that Defendant Liberty Mutual Fire Insurance Co. ("Liberty Mutual") has a duty to defend Plaintiff in the underlying action styled as *Leaf Trading Cards, LLC v. The Upper Deck Co.,* United States District Court, Northern District of Texas, Case No. 3:17-cv-3200 (the "*Leaf Action*"); **(ii)** a judicial declaration that Liberty Mutual must reimburse Upper Deck for all reasonable defense expenses it has incurred and will incur in the *Leaf Action*, plus prejudgment interest at the applicable rate from the date of invoice. Plaintiff also seeks damages from Liberty Mutual for **(iii)** its breach of contract and **(iv)** its breach of the covenant of good faith and fair dealing.

## THE PARTIES

1.     Plaintiff Upper Deck is a Nevada corporation with its principal place of business in Carlsbad, California.

2.     On information and belief, Defendant Liberty Mutual Fire Insurance Co. is a Wisconsin corporation with its principal place of business in Boston, Massachusetts.

## JURISDICTION

3.     This is an action for declaratory relief pursuant to 28 U.S.C. § 2201.

4.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that complete diversity exists between the parties, as the Plaintiff is a citizen of California and Nevada and the Defendant is a citizen of Wisconsin and Massachusetts, for purposes of diversity jurisdiction.

5.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the contract and covenant of good faith and fair dealing claims.

6.     The amount in controversy exceeds the sum or value of $75,000 exclusive of interest and costs.  In addition to other and further relief, declaratory relief is sought.

**VENUE**

7.     Venue is proper in the United States District Court for the Southern District of California pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim alleged herein occurred in this District.

8.     This complaint concerns a contract for liability insurance sold by Liberty Mutual, which contract was sold and delivered in the Southern District of California.

9.     On information and belief, Liberty Mutual is an insurance company licensed to sell and actively selling insurance policies in California, including the Southern District of California.

10.     The issuing office for the Liberty Mutual policy is San Diego, California.

11.     Liberty Mutual sold the insurance policy at issue in this case to Upper Deck, a business located in the Southern District of California where the policy was received.

12.     The Liberty Mutual policy at issue was intended to cover Upper Deck's business operations throughout California, including the Southern District of California, as well as throughout the United States.

13.     The alleged wrongful conduct described in the pleadings in the *Leaf Action* purportedly occurred within the Southern District of California.

14.     Part of the performance required under the Liberty Mutual policy at issue, including, without limitation, the payment of attorneys' defense fees, occurred within the Southern District of California, as part of the insured's defense team is located in San Diego, California.

**THE LIBERTY MUTUAL POLICY**

15.     Liberty Mutual sold Commercial General Liability Policies No. TB2-Z91-463401-024, TB7-Z91-463401-025, TB7-Z91-463401-026, TB2-Z91-463401-027 (the "Policy") to the Named Insured, Upper Deck, for the Policy Periods between December 10, 2015 through December 10, 2018. A copy of the most recent Policy No. TB2-Z91-463401-027 for December 10, 2017 through December 10, 2018 is attached

here as **Exhibit "1"**.

16.     The Policy's Insuring Agreement provides, in pertinent part, as follows:

> [Liberty Mutual] will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. [Liberty Mutual] will have the right and duty to defend the insured against any "suit" seeking those damages. However, [Liberty Mutual] will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply.
>
> …
>
> (2) [Liberty Mutual's] right and duty to defend end when [the insurer] ha[s] used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B[.]

[**Exhibit "1"** § I.B.1].

17.     The Policy's applicable limit of insurance for the "Personal & Advertising Injury Limit" is $1,000,000 [Policy §§ Declarations, III.4 (as amended by Endorsement Form No. LC 29 06 08 08 § A)].

18.     The Policy's "Who Is An Insured" provision provides:

> 1. If you are designated in the Declarations as:
>
> …
>
> d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.
>
> ...
>
> 2. Each of the following is also an insured:
>
> a. Your "volunteer workers" only while performing duties related to the conduct or your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) … but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. …

[**Exhibit "1"** §§ II.1.a, II.2.a].

COMPLAINT

19.     The Policy includes the following pertinent Definitions:

"Advertisement" means a paid announcement that is broadcast or published in the print, broadcast or electronic media to the general public or specific market segments about your goods, products or services for the purposes of attracting customers or supporters. For the purposes of this definition:

a. Announcements that are published include material placed on the Internet or on similar electronic means of communication; and

b. Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

* * *

"Coverage territory" means:

a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

…

c. All other parts of the world if the injury or damage arises out of:

…

(3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication[.]

* * *

"Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

"Executive officer" means a person holding any of the officer positions created by your charter, constitution, bylaws or any other similar governing document.

* * *

"Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

…

d. Oral or written "publication" directly to the public at large of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or

services.

e. (1) Oral or written "publication" directly to the public at large of material that violates a person's right of privacy;

(2) Oral or written "publication" of material that violates a person's right of privacy by misappropriation of that person's name or likeness;

f. The use of another's advertising idea in your "advertisement"; or

g. Infringing upon another's copyright, trade dress or slogan in our "advertisement".

\* \* \*

"Publication" means an insured's act of disseminating or broadcasting material or information. Publication does not include the wrongful appropriation, interception or retrieval of material or information by a third party or the insured's dissemination or broadcasting of material or information to a person who is the subject of the material or the information.

"Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged.

[**Exhibit "1"** §§ V.1 (as amended by Endorsement Form No. LC 29 08 10 11), V.4-6, V.14 (as amended by Endorsement Form No. LC 29 04 08 08), V.18-19].

20.     The Policy includes the following pertinent exclusions (as identified by Liberty Mutual):

This insurance does not apply to:

a. Knowing Violation Of Rights Of Another

"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

b. Material Published With Knowledge Of Falsity

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

c. Material Published Prior to Policy Period

"Personal and advertising injury" arising out of oral or written publication, in any manner, of material whose first

publication took place before the beginning of the policy period.

…

k. Electronic Chatrooms Or Bulletin Boards

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

[**Exhibit "1"** § I.B.2].

21.    The Policy's "Other Insurance" provide, in pertinent part, as follows:

If other valid and collectible insurance is available to the insured for a loss [Liberty Mutual] cover[s] under Coverages A or B of this Coverage Part, [Liberty Mutual's] obligations are limited as follows:

a. Primary Insurance

This insurance is primary except when Paragraph b. below applies. If this insurance is primary, [Liberty Mutual's] obligations are not affected unless any of the other insurance is also primary. Then, [Liberty Mutual] will share with all that other insurance by the method described in Paragraph c. below.

b. Excess Insurance

(1) This insurance is excess over:

(a) Any of the other insurance, whether primary, excess, contingent or on any other basis:

(i) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(ii) That is Fire Insurance …

(iii) That insurance purchased by you to cover your liability as a tenant …

(iv) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft …

(b) Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

[**Exhibit "1"** § IV.4].

## THE UNDERLYING *LEAF ACTION*

22.     On November 22, 2017, claimant Leaf Trading Cards, LLC ("Leaf") filed its complaint ("Leaf Complaint") against Plaintiff Upper Deck in the action styled as *Leaf Trading Cards, LLC v. The Upper Deck Co.*, United States District Court for the Northern District of Texas, Case No. 3:17-cv-3200 (the "*Leaf Action*"). A copy of the Leaf Complaint is incorporated herein and attached as **Exhibit "2"**.

23.     Pertinent allegations from the Leaf Complaint establish "personal and advertising injury" that create a potential for coverage under the Liberty Mutual Policies triggering its defense obligation:

> 13. Also on information and belief, Leaf understands that Upper Deck employees have (a) used confidential or false internet personas to erroneously and maliciously spread misinformation and negative reviews of Leaf products, (b) compensated dealers and consumers to erroneously and maliciously spread misinformation and negative reviews of Leaf products, and (c) compensated dealers to discontinue carrying Leaf products, all in an effort to harm Leaf and to restrain trade and eliminate competition.

[**Exhibit "2"** ¶ 13].

24.     On August 17, 2018, Leaf filed a First Amended Complaint ("Leaf FAC"). A copy of the Leaf FAC is attached as **Exhibit "3"**.

25.     Pertinent allegations from the Leaf FAC establish "personal and advertising injury" that create a potential for coverage under the Liberty Mutual Policies triggering its defense obligation:

> 12. … Upper Deck has told retail sellers of its hockey player trading cards that if they were to carry potentially competing Leaf products, those retailers could face retribution in the form of lost status and purchasing benefits. This problem is compounded by the terms of the non-disclosure covenants insisted on by Upper Deck with its Exclusive Distributors who are prohibited from telling retailers <u>why</u> those major distributors do not carry Leaf products, leading to a perception by retailers that Leaf products are not sold by the Exclusive Distributors because Leaf products are inferior.
>
> 13. In more detail, distributors were forced to email Upper Deck with any and all solicitations for Leaf products and receive confirmation that such products did not violate the Exclusive Distributor contracts. In some responses, Upper Deck provided that the distributor should check with the

manufacture to see if they intend to include any content in violation of the Exclusive Distributor contract – *i.e.*, Leaf products. If the distributors did not and/or was in possession of a Leaf product, they would receive a letter form Upper Deck that served as a notice of breach of distributor agreement.

14. In other words, Upper Deck told distributors that Leaf was selling infringing and illegal products and that if distributors considered selling any of Leaf's products, they would not only be in breach of contract but also be in similar violation of the law and exposed to direct liability.

15. This accomplished two things. First, it disparaged Leaf's business, suggesting to distributors (without evidence) that Leaf was a corrupt company. Upper Deck's references in public filings that Leaf engages in "vulturine activity" showcases this point. Second, Upper Deck's disparagement of Leaf's products provided another way in which it was able to foreclose Leaf's sales outlets.

* * *

18. Also on information and belief, Leaf understands that Upper Deck employees have (a) used confidential or false internet persons to erroneously and maliciously spread misinformation and negative reviews of Leaf products, (b) compensated dealers and consumers to erroneously and maliciously spread misinformation and negative reviews of Leaf products, and (c) compensated dealers to discontinue carrying Leaf products, all in an effort to harm Leaf and to restrain trade and eliminate competition.

* * *

34. Upper Deck published disparaging words about Leaf's economic interests to distributors and others. For example, the words, among other things, caused doubt about the quality of Leaf's products.

[**Exhibit "3"** ¶¶ 12-15, 18, 34].

26.    On January 25, 2019, Leaf filed a Second Amended Complaint ("Leaf SAC"). A copy of the Leaf SAC is attached here as **Exhibit "4"**.

27.    Pertinent allegations from the Leaf SAC establish "personal and advertising injury" " that create a potential for coverage under the Liberty Mutual Policies triggering its defense obligation:

4. In sum, through the exclusive contracts with the NHL and NHLPA, illegal exclusive dealing arrangements with distributors, disparagement of Leaf and its products based on the knowingly false statement that Leaf peddles in illegal

8

products, and interference with Leaf's contracts, upper Deck has managed to throttle competition in the market for hockey player trading cards. Upper Deck's stranglehold on this market has excluded any potential competitor – including Leaf – from access to the necessary player images and distributors to achieve the scale and efficiencies to compete in the market for hockey player trading cards. Leaf therefore seeks injunctive relief and monetary damages from Upper Deck based on its anticompetitive conduct, among other things.

\* \* \*

17. In addition, Upper Deck has told retail sellers of its hockey player trading cards that if they were to carry potentially competing Leaf products, those retailers could face retribution in the form of lost status and purchasing benefits. This problem is compounded by the terms of the non-disclosure covenants insisted on by Upper Deck with its Exclusive Distributors who are prohibited from telling retailers why those major distributors do not carry Leaf products, leading to a perception by retailers that Leaf products are not sold by the Exclusive Distributors because Leaf products are inferior.

18. In more detail, distributors were forced to email Upper Deck with any and all solicitations for Leaf products and receive confirmation that such products do not violate the Exclusive Distributor contracts. In some responses, Upper Deck provided that the distributors should check with the manufacture to see if they intend to include any content in violation of the Exclusive Distributor contract – i.e., Leaf products. If the distributor was in possession of a Leaf product, he would receive a letter form upper Deck that served as a notice of breach of the distributor agreement.

19. In other words, Upper Deck has told distributors that Leaf was selling infringing and illegal products and that if distributors considered selling any of Leaf's products, they would not only be in breach of contract but also be in similar violation of the law and exposed to direct liability.

20. This accomplished two things. First, it disparaged Leaf's business, suggesting to distributors (without evidence) that Leaf was a corrupt company. Second, there was a reasonable probability that Leaf would have entered into a business relationship with, among others, Universal Distribution, Grosnor Distribution, GTS Distribution, Southern Hobby Distribution, and Magazine Exchange, Inc., as prior to the Exclusive Distributor contracts, Leaf had continuing business relations with these distributors. Upper Deck, however, tortuously interfered with those prospective business relations of Leaf.

21. In addition, on or about May 31, 2016, Leaf entered an agreement with Serena Williams – Statement of Authenticity

and Agreement – that granted Leaf the right to reproduce and distribute Ms. Williams likeness, statistics, biographical information, etc. for the purpose of producing and prompting trading cards, among other things. Upper Deck, however, has interfered with Leaf's relationship with Ms. Williams. In fact, Upper Deck filed a motion for preliminary injunction against Leaf claiming, among other things, that Leaf profiteers off of the names and likenesses of athletes like Patrick Roy and Serena Williams, without their consent and without compensation for the use of their valuable and hard-earned reputation as stars on and off their respective fields of play.

* * *

44. Upper Deck published disparaging words about Leaf's economic interests to distributors and others. For example, the words, among other things, caused doubt about the quality of Leaf's products.

* * *

58. Leaf had a valid contract with Serena Williams (i.e., the Statement of Authenticity and Agreement) to which Upper Deck is a stranger. Leaf had a valid contract with Patrick Roy (i.e, the Statement of Authenticity and Agreement) to which Upper Deck is a stranger.

59. Upper Deck willfully and intentionally interfered with these contracts, as Upper Deck was aware of the contract, as discussed above. Nonetheless, Upper Deck filed a motion for preliminary injunction to "enjoin[] Leaf from any further manufacture or sale of trading cars [sic] that bear the personality rights of [Mr. Roy and Ms. Williams] . . . and . . . requiring seizure of [such] counterfeit goods." In addition, Upper Deck has made the performance impossible or more burdensome, difficult, or expensive.

* * *

WHEREFORE, Leaf Trading Cards, LLC, prays that final judgment be entered against The Upper Deck Company declaring, ordering, and adjudging that:

…

e. Upper Deck disparaged Leaf[.]

[**Exhibit "4"** ¶¶ 4, 17-21, 44, 58-59, Prayer for Relief].

28.    Leaf seeks and has sought monetary damages from Upper Deck for the various allegedly wrongful acts.

29.    The Leaf SAC alleged six (6) causes of action: (1) Violation of the

1  Sherman Act (15 U.S.C. § 1); (2) Violation of the Sherman Act (15 U.S.C. § 2); (3)

2  Violation of the Clayton Act (15 U.S.C. § 14); (4) Business Disparagement; (5)

3  Tortious Interference with Prospective Business Relations; (6) Tortious Interference

4  with Existing Contract.

**TENDER TO LIBERTY MUTUAL AND ITS ACKNOWLEDGMENT**

**OF POTENTIAL COVERAGE REQUIRING DEFENSE**

7       30.     Upper Deck requested a defense of the *Leaf Action* from Liberty Mutual

8  on or about November 29, 2017.

9       31.     Liberty Mutual acknowledged receipt of the request for defense of the

10  *Leaf Action* on November 29, 2017. A copy of the acknowledgment email sent by

11  Liberty Mutual to Upper Deck is attached as **Exhibit "5"**.

12       32.     Liberty Mutual acknowledged its duty to defend the *Leaf Action* subject

13  to a reservation of rights on March 23, 2018. A copy of that letter is attached as

14  **Exhibit "6"**.

15       33.     Liberty Mutual agreed in the March 23, 2018 reservation of rights letter

16  that coverage under the Liberty Mutual Policy's "Disparagement Offense" is triggered

17  at least by Leaf's allegation that "Upper Deck employees have used confidential or

18  false internet personas and compensated dealers and consumers to erroneously and

19  maliciously spread misinformation and negative reviews of Leaf products" "on the

20  Internet during the period of the [Policy]." [**Exhibit "6"** p. 16].

21       34.     Liberty Mutual alleged in the March 23, 2018 reservation of rights letter

22  that it is reserving rights to disclaim coverage based on "during the policy period",

23  "Material Published Prior To Policy Period" exclusion, "publication" definition, and

24  the exclusions for "Knowing Violation Of Rights Of Another", "Material Published

25  With Knowledge Of Falsity", or "Electronic Chatrooms Or Bulletin Boards". [**Exhibit**

26  **"6"** p. 16].

27       35.     Liberty Mutual did not allege in the March 23, 2018 reservation of rights

28  letter that its reserved rights are implicated and provided no analysis that would justify

a failure to meet its obligation to defend. Instead Liberty Mutual promised to defend the *Leaf Action*.

### LIBERTY MUTUAL CONCEDED UPPER DECK'S RIGHT TO INDEPENDENT DEFENSE COUNSEL

36.    Liberty Mutual agreed in the March 23, 2018 reservation of rights letter that its reservation of rights created a conflict of interest that "entitles Upper Deck to select a qualified attorney to defend it at our expense under California Civil Code section 2860." [**Exhibit "6"** p. 17].

37.    Liberty Mutual acknowledged in the March 23, 2018 reservation of rights letter that Upper Deck had "retained the services of the law firms of Jackson Walker LLP and Nicholas & Tomasevic LLP in connection with the [Leaf Action]" as its independent defense counsel. [**Exhibit "6"** p. 17].

### LIBERTY MUTUAL'S BREACH – FAILURE TO PAY FOR JACKSON WALKER'S DEFENSE FEES

38.    Upper Deck had retained the services of Nicholas & Tomasevic LLP ("N&T") because N&T has strong business litigation experience and is familiar with Upper Deck, Upper Deck's industry, and Upper Deck's dispute with Leaf prior to the Leaf SAC. N&T had filed an initial action against Leaf in the Southern District of California.

39.    Leaf obtained a transfer of Upper Deck's suit from the Southern District of California to the Northern District of Texas where it was consolidated with the *Leaf Action* filed in that district.

40.    Upper Deck had also retained the services of Jackson Walker LLP ("JW") because of Leaf's claims in the Northern District of Texas. JW could act as local counsel in Dallas, Texas in response to Leaf's claims.  In addition, JW has specialized antitrust experience to assist Upper Deck in defending against Leaf's antitrust claims made against Upper Deck.

41.    Liberty Mutual made a meritless assertion in its March 23, 2018

reservation of rights letter that "Liberty Mutual's obligations under Section 2860 are limited to the payment of fees charged by one law firm selected by Upper Deck." [**Exhibit "6"** p. 17].

42.     California Civil Code Section 2860 provides:

> When the insured has selected independent counsel to represent him or her, the insurer may exercise its right to require that the counsel selected by the insured possess certain minimum qualifications which may include that the selected counsel have (1) at least five years of civil litigation practice which includes substantial defense experience in the subject at issue in the litigation, and (2) errors and omissions coverage. The insurer's obligation to pay fees to the independent counsel selected by the insured is limited to the rates which are actually paid by the insurer to attorneys retained by it in the ordinary course of business in the defense of similar actions in the community where the claim arose or is being defended.

Cal. Civ. Code § 2860(c).

43.     Cal. Civ. Code Section 2860 does not provide that Liberty Mutual may limit its payment of fees to those charged by a single law firm, and no Policy provision restricts Liberty Mutual's obligation to pay for whatever and however many lawyers are reasonably necessary to defend a potentially covered lawsuit.

44.     Liberty Mutual has entirely refused to pay for any of JW's fees necessarily incurred in the defense of Upper Deck in the *Leaf Action* since the date of the tender of defense.

## LIBERTY MUTUAL'S BREACH –
## FAILURE TO PAY FOR N&T'S DEFENSE FEES

45.     At first, Liberty Mutual partially paid defense invoices of N&T.

46.     Liberty Mutual made seven payments in response to seven defense invoices of N&T. Those payments only partially paid for defense expenses reflected on the N&T invoices for the defense work done in November 2017 through March 2018. But then Liberty Mutual entirely stopped making any defense payments.

47.     Although Liberty Mutual has purported to conduct some audits on N&T invoices past April 2018, Liberty Mutual has made no defense payments since then.

Liberty Mutual has refused, without good cause, to make any defense payments for the past year before this suit was filed.

48.     Although Upper Deck has repeatedly asked for payment of defense expenses incurred in the defense of the *Leaf Action* and although Liberty Mutual has claimed that it is "defending" the *Leaf Action,* Liberty Mutual has failed and refused to resume payments of defense expenses as it has repeatedly promised to do. It has not defended Upper Deck at all for a year. Before it stopped paying any defense expenses, Liberty Mutual had only partially defended its insured by paying only part of its reasonable defense expenses.

## FIRST CAUSE OF ACTION
### Declaratory Relief – Duty to Defend

49.     Plaintiff, by this reference, incorporates each and every allegation set forth in the above paragraphs of this Complaint as though fully alleged herein.

50.     A valid contract exists between Upper Deck and Liberty Mutual, namely, the Policy.

51.     Upper Deck has fully performed all of the obligations and conditions to be performed by it under the Policy and has paid premiums owed under the Policy each month the Policy has been in force.

52.     By issuing and delivering the Policy and taking payments from Upper Deck, Liberty Mutual agreed to provide a defense for suit seeking damages for "personal and advertising injury" offenses as defined in the Policy, which include, among other things, claims for disparagement.

53.     The *Leaf Action* alleges facts implicating coverage under the Policy as "personal and advertising injury", thereby triggering Liberty Mutual's obligation to defend its insured, Upper Deck, in the *Leaf Action*.

54.     No exclusions would bar Liberty Mutual from defending Upper Deck in the *Leaf Action*.

55.    Liberty Mutual has acknowledged the potential for coverage in its reservation of rights letter and also expressly acknowledged that it has an obligation to defend Upper Deck in the *Leaf Action*.

56.    Liberty Mutual is obligated under the Policy to pay attorneys' fees, costs, and other expenses that its insured, Upper Deck, incurs in the defense of the *Leaf Action*.

57.    Liberty Mutual's duty and obligation to defend Upper Deck in the *Leaf Action* further includes the duty to reimburse Plaintiff for all the defense expenses they incur in the *Leaf Action*.

58.    Liberty Mutual has only partially paid some of N&T's defense invoices through April 2018 and has not paid any of N&T's defense invoices since then nor any of JW's defense invoices since the date of tender.

59.    An actual bona fide controversy exists between Upper Deck and Liberty Mutual that requires judicial declaration by this Court of the parties' rights and duties regarding the Liberty Mutual's duty to defend Upper Deck in the *Leaf Action*, the amount of defense expenses owed by Upper Deck, and Upper Deck's duty to timely pay defense fees and costs.

**SECOND CAUSE OF ACTION**

**Breach Of Contract**

60.    Plaintiff, by this reference, incorporates each and every allegation set forth in the above paragraphs of this Complaint as though fully alleged herein.

61.    A valid contract exists between Upper Deck and Liberty Mutual, namely, the Policy.

62.    Upper Deck has fully performed all of the obligations and conditions to be performed by it under the Policy and has paid premiums owed under the Policy each month the Policy has been in force.

63.    By issuing and delivering the Policy and taking payments from Upper Deck, Liberty Mutual agreed to provide a defense for suit seeking damages for

"personal and advertising injury" offenses as defined in the Policy, which include, among other things, claims for disparagement.

64.     The *Leaf Action* alleges facts implicating coverage under the Policy as "personal and advertising injury", thereby triggering Liberty Mutual's obligation to defend its insured, Upper Deck, in the *Leaf Action*.

65.     No exclusions would bar Liberty Mutual from defending Upper Deck in the *Leaf Action*.

66.     Liberty Mutual has acknowledged the potential for coverage and that it has an obligation to defend Upper Deck in the *Leaf Action*.

67.     Liberty Mutual is obligated under the Policy to pay attorneys' fees, costs, and other expenses that its insured, Upper Deck, incurs in the defense of the *Leaf Action*.

68.     Liberty Mutual has only partially paid N&T's defense invoices through April 2018 and has not paid any of N&T's defense invoices since then nor any of JW's defense invoices since the date of tender.

69.     Liberty Mutual has failed to provide and pay for the defense in the *Leaf Action*.

70.     Despite repeated requests for defense in the *Leaf Action*, Liberty Mutual has failed to provide the contracted duty of defense to Upper Deck.

71.     Liberty Mutual has breached its duty to defend the Plaintiffs in the *Leaf Action*.

72.     As a result of the breach, Upper Deck incurred and continues to incur defense expenses in defending against Leaf's allegations in the *Leaf Action* and other damages.

## THIRD CAUSE OF ACTION
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

73.     Plaintiff, by this reference, incorporates each and every allegation set forth in the above paragraphs of this Complaint as though fully alleged herein.

74.     A valid contract exists between Upper Deck and Liberty Mutual, namely, the Policy.

75.     By issuing and delivering the Policy and taking payments from Upper Deck, Liberty Mutual agreed to provide a defense for suit seeking damages for "personal and advertising injury" offenses as defined in the Policy, which include, among other things, claims for disparagement.

76.     The *Leaf Action* alleges facts implicating coverage under the Policy as "personal and advertising injury", thereby triggering Liberty Mutual's obligation to defend its insured, Upper Deck, in the *Leaf Action*.

77.     No exclusions would bar Liberty Mutual from defending Upper Deck in the *Leaf Action*.

78.     Liberty Mutual has acknowledged the potential for coverage and that it has an obligation to defend Upper Deck in the *Leaf Action*.

79.     Liberty Mutual is obligated under the Policy to pay attorneys' fees, costs, and other expenses that its insured, Upper Deck, incurs in the defense of the *Leaf Action.*

80.     An implied duty of good faith and fair dealing is implicit in every contract, including insurance contracts.

81.     Liberty Mutual unreasonably asserted that it would only pay for one law firm despite neither Civil Code Section 2860 nor the Policy granting it the ability to assert this limitation.

82.     Liberty Mutual unreasonably refused to pay for any of JW's defense invoices.

83.     Liberty Mutual has unreasonably refused without good cause to pay for a year's worth of N&T's defense invoices.

84.     Liberty Mutual, despite repeated requests from Upper Deck to resume its defense payments and providing copious information regarding its breach, has continued failing to make defense payments.

85.     Since then, Liberty Mutual has unreasonably refused to respond to Upper Deck's communications regarding Liberty Mutual's duty to defend.

86.     Liberty Mutual's actions have been unreasonable and a breach of its implied covenant of good faith and fair dealing with its insured.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff The Upper Deck Company prays for judgment against Defendant Liberty Mutual Fire Insurance Company as follows:

1.     A judicial declaration that Defendant Liberty Mutual has a duty to defend Upper Deck in the underlying action styled as *Leaf Trading Cards, LLC v. The Upper Deck Co.*, United States District Court for the Northern District of Texas, Case No. 3:17-cv-3200;

2.     A judicial declaration that Liberty Mutual must reimburse Upper Deck for all the reasonable defense expenses incurred and will incur in the defense of the *Leaf Action* paid on a monthly basis plus prejudgment interest from the date of each invoice at the statutory interest rate;

3.     A determination that Liberty Mutual has breached its contract obligation to defend its insured, Upper Deck, in the *Leaf Action*;

4.     An award of damages against Liberty Mutual for its breach of the Policy contract;

5.     A determination that Liberty Mutual has breached its implied covenant of good faith and fair dealing;

6.     An award of damages against Liberty Mutual for its breach of its covenant of good faith and fair dealing;

7.     An award of Upper Deck's reasonable attorneys' fees incurred in this lawsuit;

8.     An award of the costs of this suit; and

9.     For such other and further relief as this Court may deem just and proper.

1

Dated:  April 24, 2019                              **GAUNTLETT & ASSOCIATES**

2

3                                                    By:_____/s/ James A. Lowe_____
                                                          David A. Gauntlett
4                                                         James A. Lowe

5                                                    Attorneys for Plaintiff
                                                     THE UPPER DECK COMPANY
6

7
                                    **DEMAND FOR JURY TRIAL**
8

9           Upper Deck demands a trial by jury on all issues subject to jury determination.

10

11

Dated:  April 24, 2019                              **GAUNTLETT & ASSOCIATES**
12

13

14                                                   By:_____/s/ James A. Lowe_____
                                                          David A. Gauntlett
15                                                        James A. Lowe

16                                                   Attorneys for Plaintiff
                                                     THE UPPER DECK COMPANY
17

18

19

20

21

22

23

24

25

26

27

28

244539_3                                                                    COMPLAINT